## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | | |
|---|---|---|
| EVERETT LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-1268 |
| | ) | |
| TAZEWELL COUNTY, ROBERT HUSTON, | ) | |
| Sheriff of Tazewell County, in his official | ) | |
| capacity, Tazewell County Sheriff's Deputies | ) | |
| ALEISHA KARRICK, SGT. JENNIFER | ) | |
| STANTON, CURTIS KING, DAVE HARPER, | ) | |
| MICHAEL TAYLOR, and MELISSA FORCE, | ) | |
| | ) | |
| Defendants. | ) | |

## O R D E R

This matter is now before the Court on Defendant Tazewell County, Tazewell County Sheriff Robert Huston, Aleisha Karrick, Sgt. Jennifer Stanton, Curtis King, Dave Harper, Michael Taylor and Marissa Force's ("Defendants") Motion for Summary Judgment (ECF No. 56) and Plaintiff Everett Lewis' ("Lewis") Amended Motion for Partial Summary Judgment against Defendant Aleisha Karrick ("Karrick") (ECF No. 59).  For the following reasons, Defendants' Motion (ECF No. 56) is GRANTED IN PART and DENIED IN PART and Plaintiff's Motion (ECF No. 59) is DENIED.

## PROCEDURAL BACKGROUND

On August 30, 2010, Plaintiff Everett Lewis ("Lewis") filed an eight count complaint seeking relief against Defendant Tazewell County, Tazewell County Sheriff Robert Huston, Aleisha Karrick, Sgt. Jennifer Stanton, Curtis King, Dave Harper, Michael Taylor and Marissa Force (collectively, "the Defendants") for their respective roles in Lewis' treatment once he

arrived at the Tazewell County Jail on December 9, 2009.   Specifically, Lewis alleges that Defendants Karrick, Stanton, King, Harper, Taylor, and Force ("the Defendant Officers") violated Lewis' right to be free from unconstitutional conditions of confinement and that they unlawfully denied Lewis medical attention (Counts I and IV).   Lewis argues Karrick violated the Fourth Amendment's prohibition against excessive force and committed a battery against Lewis in violation of Illinois state law when she sprayed him with oleoresin capsicum ("OC") spray and utilized a taser gun against him (Count II and VI).   Lewis argues that King, Stanton, Harper, Taylor and Force unlawfully failed to intervene when he was subjected to this alleged excessive force (Count III).   Lewis brings a *Monell* claim and an Illinois state law *respondeat superior* claim against Defendant Sheriff Robert Huston (Counts V and VII).   Finally, Lewis alleges that pursuant to the Illinois Tort Immunity Act, 745 ILCS 10/9-102, Defendant Tazewell County is liable for any judgments in this case arising from the Defendant Officers' actions (Count VIII). This Court has jurisdiction over Counts I-V pursuant to 28 U.S.C. § 1331, 1343(a), and supplemental jurisdiction over Counts VI-VIII pursuant to 28 U.S.C. § 1367.   Venue is proper in this district and division because a substantial part of the events giving rise to the claims occurred in this Court's division pursuant to 28 U.S.C. § 1391(b)(2).

On August 10, 2012, the Defendants filed their Motion for Summary Judgment (ECF No. 56) and on August 15, 2012, Plaintiff filed his Amended Motion for Partial Summary Judgment as to Aleisha Karrick (ECF No. 59).   On October 31, 2012, this Court heard oral arguments on both Motions for Summary Judgment and denied both Defendants' Motion (ECF No. 56) and Plaintiff's Motion (ECF No. 59).   The parties engaged in settlement discussions but, as of February 15, 2013, advised the Court they were unable to resolve the suit.   This order now follows.

2

## FACTUAL BACKGROUND

Below are the relevant facts taken from the parties' statements of material facts.  Unless otherwise noted, the facts are undisputed.

On December 9, 2009, Lewis, a veteran, was arrested by officers of Pekin Police Department for trespassing at a gas station and for resisting arrest. (ECF No. 56, ¶1); (ECF No. 59, ¶2).  Plaintiff asserts that, at that time, he was mentally ill and suffering from mania. *Id.* at ¶¶2, 3.  The officers then transported Lewis to the Tazewell County Jail, during which time they called and advised that Lewis was non-compliant. (ECF No. 56, ¶¶2, 4).  Upon his arrival at approximately 1:10 a.m., Defendant Officers Stanton, Force, and King met Lewis in the jail's sally port with a hand-held camera. (ECF No. 59, ¶9).  While Lewis claims he was compliant with the officers' commands, Defendants argue he did not comply promptly, he answered his initial intake questions untruthfully, he had to be directed to get out of the car and pass through the metal detector, and that he pointed his finger at an officer. (ECF No. 59, ¶10); (ECF No. 61, ¶10).

Lewis was then placed into a transfer cell by Defendant Officer Force and King. (ECF No. 59, ¶11).  Officer Stanton turned off the camera in the sally port after Lewis was placed in the transfer cell. (ECF No. 59, ¶12); (ECF No. 61, ¶12).  Lewis states that he asked for the water in his cell to be turned on, (ECF No. 59, ¶13); Defendants dispute this to the extent that the Defendant Officers do not recall Lewis making any such requests and Defendant Stanton asserts the water was turned on. (ECF No. 61, ¶13).  Lewis then began to sing and drum on the toilet in his cell. (ECF No. 59 at ¶15).  Although the Defendants claim Lewis began drumming almost immediately after he was placed in his cell, (ECF No. 56, ¶14), Lewis claims that it was not until approximately five to ten minutes before Officer Stanton resumed video recording that he began drumming. (ECF No. 59, ¶16).  The parties agree that Lewis was in the cell approximately two

3

hours before Stanton turned the camera back on. (ECF No. 59, ¶17).  Defendants allege that prior to Stanton retrieving the camera other detainees in the jail were "getting rowdy… asking Lewis to stop or if the officers could make him stop." (ECF No. 56, ¶17).  Lewis disputes this, indicating Lewis did not hear any other detainees "getting rowdy [and that] Defendant Taylor, who worked that night, did not have any detainees complain and could not hear the noise once he left the area of the transfer cell." (ECF No. 60, ¶17).  Lewis was alone in the cell and, while he did not become combative with any of the Defendant Officers, he did bang his head on the cell door to get their attention. (ECF No. 59, ¶¶18, 19); (ECF No. 56, ¶13).

Defendant Officer Karrick attempted to calm Lewis by talking to him several times but he yelled over her. (ECF No. 56, ¶15.)  Karrick verbally warned Lewis that should he continue his behavior, he would be tased. (ECF No. 56, ¶15).  Karrick followed through on her warning: approximately four minutes into the video recording, Karrick tased Lewis while he was singing and banging on the toilet. (ECF No. 59, ¶21).  Lewis fell backwards onto the ground[1] and, while there, Defendant Harper yelled and cursed at him. (ECF No. 59, ¶22).  Lewis pulled himself up to lean against the cell's bench[2]; at the same time Harper told Lewis to "stay the fuck down" and told Karrick to "hit him again."  Harper then continued to yell and curse at Lewis and he, Lewis, and Karrick argued about the propriety of tasing Lewis.  Defendant Officer King told Karrick to "give him some more juice."[3]  Instead, Karrick then directed Lewis to sit on the bench.[4]  Lewis complied and sat on the bench, put his hands behind his head, crossed his legs, and asked for a detainee report.[5]  Harper responded "you don't get one."[6]  Karrick instructed Lewis to "turn your

---

[1] The Court notes that while neither party cites this as a material fact, it is one that is clearly evidenced by the video recording. (ECF No. 53-10 at 00:04:16).
[2] (ECF No. 53-10 at 00:04:33).
[3] (ECF No. 53-10 at 00:05:04).
[4] (ECF No. 53-10 at 00:05:05).
[5] (ECF No. 53-10 at 00:05:12).
[6] (ECF No. 53-10 at 00:05:13).

face that way," indicating the corner.[7]  As he turned to the corner, Lewis continued to ask for a detainee report and an unidentified Defendant Officer placed his hand on Lewis' shoulder while Defendant Officer Taylor started to remove the taser probes.[8]  Almost immediately thereafter, Lewis shouted "I need a hospital! Get me to a hospital!" and began to fall toward the floor.[9]  The unidentified Defendant Officer (who previously placed his hand on Lewis' shoulder) and Taylor moved away from Lewis, an unidentified Defendant Officer urged, "hit him Karrick," and Karrick tased Lewis a second time.[10]  Lewis states Karrick tased him a second time because he would not stay still for her to take the probes out, (ECF No. 59, ¶24), whereas Karrick affirms that she tased him because Lewis was not complying and attempted to turn toward her in a "possibly aggressive[]" manner. (ECF No. 61, ¶24).

After the second tasing, the Defendant Officers left Lewis' cell and, approximately 30 minutes later, Lewis began to "sing and play an air guitar." (ECF No. 59, ¶26).  Officers warned Lewis at least six times that he would be sprayed with OC spray if he did not comply with their requests to stop yelling and pounding. (ECF No. 56, ¶31).  Lewis continued to drum on the toilet and Karrick warned him that unless he stopped he would get sprayed or tased.[11]  Karrick then told Lewis to sit down but, instead of doing so, Lewis began to sing.[12]  After singing, Lewis then sat on the bench, put his hands up, and crossed his legs.[13]  Karrick asked Lewis, "Oh now you're going to be quiet?" (ECF No. 59, ¶30).  Defendant Force commented, "it's too late" and Defendant Harper told Karrick to "pop it and spray." (ECF No. 59, ¶¶31, 32).  Karrick informed

---

[7] (ECF No. 53-10 at 00:05:13).
[8] (ECF No. 53-10 at 00:05:18).
[9] (ECF No. 53-10 at 00:05:20).
[10] (ECF No. 53-10 at 00:05:24-30).
[11] (ECF No. 53-10 at 00:42:08).
[12] (ECF No. 53-10 at 00:42:29).
[13] (ECF No. 53-10 at 00:42:38).

Lewis, "I'm not playing your game anymore."[14] While he was seated and not making any noise,[15] Karrick sprayed Lewis with a one-second burst of OC spray. (ECF No. 56, ¶32). Defendants allow that although Lewis was sitting down in the cell for approximately twenty-five seconds prior to the use of OC spray, Karrick deployed it because "officers are taught to follow-through on warnings to use OC spray… to ensure that inmates do not make a game out of brief periods of compliance followed by continued noncompliance." (ECF No. 56, ¶33). Lewis claims, however, that the OC spray was used to punish him. (ECF No. 60, ¶33). Both parties acknowledge that Defendant Officer Taylor was not present when the spray was used. Lewis banged on the cell window asking for help,[16] stated he needed his medicine,[17] and attempted to flush his eyes with the water in the toilet.[18] At this point, certain unidentified officers can be heard laughing.[19] Defendants assert that the water in Lewis' cell was on when he was sprayed and that he had a brief opportunity to access it. (ECF No. 61, ¶37). However, an unidentified male officer then asked that the water be turned off. (ECF No. 61, ¶37). The parties dispute whether there was human waste in the toilet. Karrick told Lewis that if he sat down and quieted down then she would help him clean his eyes.[20] Lewis did not sit down but instead continued to attempt to flush his eyes with toilet water.[21] Lewis then indicated that he had neurology problems[22] and that he was on Topamax.[23] Karrick again offered to clean Lewis' eyes if he settled down.[24] Although Defendants assert that Lewis was never heard to state that the water

---

[14] (ECF No. 53-10 at 00:42:55).
[15] (ECF No. 53-10 at 00:43:02).
[16] (ECF No. 53-10 at 00:43:30).
[17] (ECF No. 53-10 at 00:44:18).
[18] (ECF No. 53-10 at 00:44:21).
[19] (ECF No. 53-10 at 00:44:23).
[20] (ECF No. 53-10 at 00:44:37).
[21] (ECF No. 53-10 at 00:44:46).
[22] (ECF No. 53-10 at 00:45:05).
[23] (ECF No. 53-10 at 00:45:23).
[24] (ECF No. 53-10 at 00:45:11).

was not working in his cell, (ECF No. 56, ¶39), Lewis clearly says, "I need water in here. There's no water in this cell," to which Karrick replied "[w]e're gonna help you clean it up in a little bit."[25]  The parties dispute the interaction between Lewis and Karrick: Lewis claims he was never given assistance to flush his eyes of the OC spray, (ECF No. 59, ¶44) whereas Defendants claim Lewis was offered assistance to flush his eyes, but refused it. (ECF No. 61, ¶44).

## STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).  To determine whether there is a genuine issue of material fact, this Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).  This standard applies when cross motions for summary judgment are filed, *Franklin v. City of Evanston*, 384 F.3d 838, 843 (7th Cir. 2004), and each motion will be analyzed separately under their respective applicable standards. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n.4 (7th Cir. 2008).

The Supreme Court has held that where a videotape entered into record evidence "captur[es] the events in question... [and] there are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," *Scott v. Harris*, 550 U.S. 372, 378 (U.S. 2007), there can be no genuine dispute as to the those facts, and the Court need not credit a conflicting version of those facts for purposes of ruling on a motion for summary judgment. *Id.* at 380.

---

[25] (ECF No. 53-10 at 00:54:06)

# DISCUSSION

## I.     Plaintiffs' Motion for Summary Judgment

The Court first turns to Lewis' Amended Motion for Partial Summary Judgment (ECF No. 59) against Defendant Officer Karrick.  In his Motion, Lewis claims that Karrick's usage of OC spray against him violated his Fourth Amendment right to be free from the use of excessive force and that she committed a battery against him in violation of Illinois state law.

### a.   Neither Plaintiff Lewis nor Defendant Karrick is entitled to summary judgment on Plaintiff's Fourth Amendment claim of excessive force.

The Court first considers Lewis' request that it grant summary judgment in his favor against Defendant Officer Karrick.  While Lewis argues his claim should be analyzed under the Fourth Amendment's protection against excessive force, the Defendants maintain it should be considered using the Fourteenth Amendment's due process protection.   It is this Court's determination that Lewis was protected by the Fourth Amendment at the time Karrick utilized OC spray against him.

In *Wilkins v. May*, the Seventh Circuit rejected the notion of a "continuing seizure," holding that seizure ends after an individual has been placed in custody, and that within the gap period between arrest and being charged the Fourteenth Amendment's due process protections apply. *Wilkins v. May*, 872 F.2d 190, 193 (7th Cir. 1989).  Later that year, the Supreme Court announced in *Graham v. Connor* that claims alleging law enforcement officers used excessive force in the course of an arrest, investigatory stop, or other seizure are properly analyzed under the Fourth Amendment's protection against unreasonable seizures. *Graham v. Connor*, 109 S. Ct. 1865, 1871 (1989).  The Supreme Court noted, "[o]ur cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the

deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today." *Id.* at n.10.

As the Seventh Circuit had occasion to further articulate its standard, it subsequently determined "our cases hold that the *Gerstein* probable cause hearing is the event that terminates the Fourth Amendment's applicability following a warrantless arrest" and that "due process regulates the period of confinement after the initial determination of probable cause." *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) (quoting *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992)) (citing *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 n.14 (7th Cir. 2000); (following a *Gerstein* probable cause hearing the Fourth Amendment no longer applies); *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) (Fourth Amendment governs the period before the probable cause hearing and Due Process Clause applies after); *Reed v. City of Chicago*, 77 F.3d 1049, 1052 (7th Cir. 1996) (the "seizure" of an arrestee ends after the *Gerstein* probable cause hearing)).

The Defendants argue that the standard governing the use of force to control an unruly inmate within a jail differs from the facts of the above-mentioned cases. Specifically, the Defendants argue that in the instant case, the Defendant Officers working at the Tazewell County Jail "must be able to maintain order and discipline... [and] must be able to apply rules uniformly to all of the persons in its custody." (ECF No. 61 at 13). The Defendants argue that, in contrast to arresting officers, they have no discretion to "decide to make an arrest, issue a citation, or seek a warrant from the court... [but instead] once the person arrives at the jail, the jail must house them and control them." *Id.* However, the Seventh Circuit has held that a pretrial detainee's claim of constitutionally inadequate medical care who had been held in a city lockup facility was properly governed by "the Fourth Amendment's reasonableness standard... rather than the

deliberate indifference standard derived from the Eighth Amendment and applied to claims from detainees awaiting a trial by virtue of the Due Process Clause." *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). In making this determination, the Seventh Circuit relied on *Lopez* to conclude, "because [the detainee] had not yet benefitted from a judicial determination of probable cause… the Fourth Amendment applies." *Id.* Accordingly, it is this Court's finding that the jail setting in which the Defendant Officers operated does not merit a separate constitutional analysis.

The Defendants also argue that *Forrest v. Prine*, 620 F.3d 729 (7th Cir. 2010) requires this court to apply the Fourteenth Amendment standard to claims by arrestees in jail who have not yet benefitted from a *Gerstein* probable cause hearing. Therein, the Seventh Circuit held "[a]lthough we have not yet had occasion to define precisely the contours of [the Fourth Amendment's temporal limitations], the events that unfolded in this case place Mr. Forrest's claim outside the temporal bounds of the Fourth Amendment." *Id.* at 743; (*Cf. Wilkins*). To be certain, this Court's reading of *Forrest v. Prine* seems to directly contradict the Seventh Circuit's holdings in *Ortiz* and *Lopez*. The Northern District of Illinois confronted a similar dilemma in *Pashova v. Geist*, 2012 U.S. Dist. LEXIS 43760 (N.D. Ind. Mar. 29, 2012). In that case, the Court ruled "*Forrest* stands directly contrary to *Lopez*, and both are 'good' law… [n]ormally this court would follow the more recent case, but after careful consideration the court is convinced that *Lopez* is the more definitive statement of the rule." *Id.* The Court went on to hold that because *Forrest* did not address prior Seventh Circuit cases which defined the Fourth Amendment's temporal limitations – namely, *Villanova*, *Reed*, *Luck*, *Brokaw*, and *Lopez* – *Forrest* could not contradict the well-settled standard that the Fourth Amendment applies where an arrestee has not yet had a probable cause hearing. This Court agrees with the *Pashova* Court

10

that the *Forrest* opinion is at odds with well-established Seventh Circuit precedent but that, in any event, *Ortiz* requires this Court to apply the protections afforded by the Fourth Amendment to Lewis' claim.

In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court outlined the framework to review a claim of excessive force brought under Section 1983. First, the Court begins its analysis by "identifying a specific constitutional right allegedly infringed by the challenged application of force." *Graham*, 490 U.S. at 394. The Fourth Amendment's protection "to be secure in their persons... against unreasonable seizures" is the source for which an individual can satisfy the constitutional right requirement. The Court must then turn its analysis to the constitutional amendment. *Graham*, 490 U.S. at 394.

"The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances[.]" *Id.* at 399. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable Defendant on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "[T]he question is whether the Defendants' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Every day correctional officers must maintain order and discipline within the confines of a jail. Much like arresting officers, application of physical force may be necessary from the correctional officers in fulfilling their duty. *Id.* at 396. Reasonableness under the Fourth Amendment requires a balance of "the nature and quality of the intrusion on the individual's Fourth Amendment interest" and the governmental interest of the Defendant Officers being able to fulfill their duties. *Id.* In determining reasonableness, the court must look at the specific circumstances of the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the Defendants or others, and whether

11

he is actively resisting arrest or attempting to evade arrest by flight." *Id.*  No single factor is determinative as the Court must examine the "totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interest was justified by the countervailing governmental interest at stake." *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000).

Although a close call, in viewing the facts in the light most favorable to Karrick, a reasonable juror could find that the force used when employing OC spray against Lewis meets the "objectively reasonable" standard as outlined in *Graham*.  As illustrated by the video recording, Lewis received more than one warning that if he continued to drum on the toilet and sing he would be sprayed or tased.  After his initial noncompliance, Lewis sat down on the cell bench and was quiet.  Lewis asserts that the OC spraying was used as punishment whereas Karrick claims she sprayed Lewis because officers must follow through on warnings to ensure that inmates do not make a game out of brief periods of compliance followed by continued noncompliance.  Furthermore, Karrick argues that Lewis' drumming and singing caused a dangerous situation in the jail because he was disrupting other inmates.  Based on this record, the Court finds that there is a dispute as to the material facts that prevents it from granting summary judgment in Lewis' favor.  As such, Lewis' Amended Motion for Summary Judgment (ECF No. 59) is DENIED on this ground.

Likewise, the Court finds granting Defendants' Motion for Summary Judgment (ECF No. 56) as to the excessive force claim would not be appropriate.  As outlined above, Lewis argues Karrick "was punishing Plaintiff for his prior annoying behavior when she sprayed him." (ECF No. 64 at 12).  Lewis asserts this was done despite no resistance on his part, that he was "sitting down, just at [sic] the Defendants asked him to do," *Id.*, but that nevertheless "Karrick sprayed Plaintiff, told him to 'keep it up' and made sure the water was off in his cell." *Id.*  Based on this

12

record, the Court finds that there is a dispute as to the material facts which precludes Defendants' Motion for Summary Judgment (ECF No. 56) on this ground.

### b. **Neither Plaintiff Lewis nor Defendant Karrick is entitled to summary judgment on Plaintiff's state law battery claim.**

Both Lewis and Karrick argue they should be granted summary judgment with respect to Lewis' state law battery claim. For the reasons set forth below, both Lewis' Motion for Summary Judgment (ECF No. 59) and Defendants' Motion for Summary Judgment (ECF No. 56) are DENIED as to this claim.

Under Illinois law, a person commits battery if he "knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 Ill. Comp. Stat. 5/12-3. The record contains facts that, if accepted by a jury, would meet this definition: Lewis claims and the video evidence shows Karrick sprayed him in the face with OC spray. Moreover, Lewis argues that Karrick sprayed him not "to maintain order in the Jail but... to punish Plaintiff for his prior behavior." (ECF No. 64 at 12). A jury might well conclude from Lewis' version of the facts that the OC spray not only harmed him but was done to maliciously punish him rather than to maintain order. Because at this stage the Court construes the facts and all reasonable inferences in favor of the nonmoving party, the Court denies Defendants' Motion for Summary Judgment (ECF No. 56) as to this claim.

Karrick, however, maintains that "[s]he used the taser and OC spray [to maintain order in the jail]," (ECF No. 61 at 28), and that, after "tolerat[ing] Lewis' disturbance for a substantial period of time [she then] used the OC spray. She warned Lewis numerous times before the use of each." (ECF No. 61 at 28). It is this Court's ruling that, construing the facts and all reasonable inferences in favor of Karrick, it would be inappropriate to grant Lewis' Motion for Summary

13

Judgment. (ECF No. 59).   A reasonable jury could find that Karrick, charged with maintaining order in the jail, opted to utilize the taser and OC spray against Lewis in the interest of both the officers' and Lewis' safety.

Defendants cite to the Illinois Tort Immunity Act which shields public employees from liability for actions committed "in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 Ill. Comp. Stat. 10/2-202.   A defendant's acts are willful and wanton if they show "an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1-210.   Karrick argues that because "Deputies Brock and Brown testified that [her] actions were consistent with the training that they provided to correctional officers... [thus] Karrick's actions cannot be considered 'wilful [sic] and wanton.'" (ECF No. 61 at 28).   A determination of "whether an officer's actions amount to willful and wanton misconduct is normally reserved for the trier of fact." *Shuttlesworth v. City of Chicago*, 377 Ill. App. 3d 360, 366 (2007); *see also Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008).   Under Lewis' version of the facts as outlined above, he is entitled to have a jury determine whether Karrick engaged in actions for which she can be held liable under Illinois law. Accordingly, the Court denies Defendants' Motion for Summary Judgment as to Lewis' state law battery claim against Karrick.

## II.    **Defendants' Motion for Summary Judgment**

The Court now turns to the Defendants' Motion for Summary Judgment (ECF No. 56). Therein, Defendants argue that they are entitled to summary judgment on Lewis' claims of unconstitutional conditions of confinement because "there is no evidence that Lewis was deprived of a [sic] any needs during his brief period of confinement." (ECF No. 56 at 2-3).

Defendants likewise argue there is no evidence to support the claim of deliberate indifference to Lewis' medical needs. Because there are no underlying constitutional violations, the Defendants argue that both Lewis' claims for failure to intervene and his *Monell* claim necessarily fail. Moreover, Defendants argue that "even if constitutional violations were committed, the Defendant Officers are entitled to qualified immunity." (ECF No. 56 at 3). Finally, Defendant Huston claims he is entitled to summary judgment as to Lewis' state law *respondeat superior* claim.

### a.  Lewis' Conditions of Confinement Claim against the Defendant Officers

In Count I of his complaint, Lewis alleges that the Defendant Officers subjected him to unconstitutional conditions of confinement. The Defendant Officers argue that Lewis has failed to show that he was subject to extreme deprivations and that, to the extent the conditions in the Tazewell County Jail were harsh, Lewis was merely confined for a period of 12 hours. In his response, Lewis contends "that he was in a cell for over 2 hours without active plumbing, a toilet filled with dirty toilet water, and no toilet paper… that after he used the toilet, he asked for toilet paper and one of the Defendant-Officer [sic] told Plaintiff to use his hand," (ECF No. 60 at 13), and that Lewis was forced to "flush his eyes with dirty toilet water after he was sprayed." *Id.* at 14.

It is this Court's ruling that the analysis above determining that the Fourth Amendment's objective reasonableness standard applies to Lewis' excessive force claim likewise applies to his conditions of confinement claim. *See Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007) (finding that claims regarding conditions of confinement for pretrial detainees who have not yet had a judicial determination of probable cause are governed by the Fourth Amendment and its objectively unreasonable standard); *see also Lopez v. Chicago*, 464 F.3d 711, 719 (7th Cir.

2006).  The Seventh Circuit has held that, in the context of pretrial detainees, "[t]he Constitution requires the state to provide an environment safe from excessive health hazards, not one free of minor contaminants." *Moore v. Monahan*, 428 Fed. Appx. 626, 630 (7th Cir. 2011) (citing *Carroll v. DeTella*, 255 F.3d 470, 472-73 (7th Cir. 2001)).

In viewing the facts in the light most favorable to Lewis, a reasonable juror could find that the conditions in which Lewis was kept were not safe from excessive health hazards.  The Defendant Officers "do not recall [Lewis] requesting water or toilet paper," (ECF No. 56 at 10), claim there is no evidence "that the water was turned off in [Lewis'] cell," *Id.*, and maintain Lewis was offered assistance to flush his eyes, but refused it. (ECF No. 61, ¶44).  However, Lewis claims he was never given assistance to flush his eyes of the OC spray, (ECF No. 59, ¶44), and that he was forced to flush his eyes with dirty toilet water thereafter. (ECF No. 60 at 14).  Based on this record, the Court finds that there is a dispute as to the material facts underlying the core elements of this claim and DENIES Defendants' Motion for Summary Judgment (ECF No. 56) as to Lewis' claim for unconstitutional conditions of confinement.

**b.  Lewis' Failure to Intervene Claim against the Defendant Officers**

In Count III, Lewis alleges that Defendant Officers King, Stanton, Harper, Taylor, and Force failed to intervene when he was subjected to the excessive force allegedly meted out by Defendant Officer Karrick.  Defendants argue that because Officer Karrick's actions do not constitute excessive force, the remaining Defendant Officers cannot be liable for a failure to intervene.  Defendants also argue that "the undisputed facts establish that a number of officers had limited or no involvement in the conduct about which Lewis complains, nor did they have an opportunity to intervene...and Taylor was not present when the OC spray was used." (ECF No. 56 at 17).  Lewis admits that Taylor was not present when the OC was sprayed, (ECF No. 60,

¶34), and during oral arguments Lewis conceded that, with respect to this act only, there was no failure to intervene claim against Officer Taylor. Given Plaintiff's concession and there being no dispute of material fact, the Court GRANTS IN PART Defendant's Motion as to Defendant Officer Taylor with respect to the failing to intervene for the allegedly unconstitutional use of OC spray.

A police officer "has a duty under § 1983 to intervene to prevent... the use of excessive force if the officer is informed of the facts that establish a constitutional violation and has the ability to prevent it." *Montano v. City of Chicago*, 535 F.3d 558, 569 (7th Cir. 2008) (internal citation omitted). A plaintiff must produce sufficient evidence that an officer "had reason to know... excessive force was being used... *and*... had a realistic opportunity to intervene to prevent the harm from occurring." *Id. citing Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994) (emphasis in original). The calculus surrounding the realistic opportunity to intervene "almost always implicates questions of fact for the jury." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). As indicated above, the record establishes that there remains a dispute as to whether Karrick's use of OC spray against Lewis was objectively reasonable. A reasonable jury could find that the remaining Defendant Officers had reason to know that Officer Karrick was using excessive force. Moreover, Lewis has provided sufficient facts that would allow a jury to believe that the remaining Defendant Officers had a realistic opportunity to intervene given that Lewis alleges he "was in a locked transfer cell alone and the Defendants can all be seen and heard on video plotting to tase and then spray the Plaintiff." (ECF No. 60 at 18). As such, there is a real possibility that Lewis' constitutional rights were violated and Officers King, Stanton, Harper, and Force had a reasonable opportunity to intervene. Accordingly, Defendants' Motion (ECF No. 56) is DENIED as to Officers King, Stanton, Harper, and Force.

c.  **Lewis' Denial of Medical Attention Claim as to the Defendant Officers**

Count IV of Lewis' Complaint contemplates Lewis' claim against the Defendant Officers for being deliberately indifferent to his serious mental health medical need. Lewis argues that the Defendant Officers were aware of a substantial risk to his health because they observed him in a manic state, observed Officer Karrick tase and spray him, and then denied him necessary medical attention. The Defendant Officers claim that they did not have the "requisite actual knowledge of Lewis' medical history or claimed medical needs prior to December 9, 2009," (ECF No. 56 at 18), that Lewis' behavior prevented them from reviewing any medical information that may have been on file, *see id.,* that Lewis was given a bandage following the tasing but that he refused further offers to clean him after the tasings and OC spray, *see id.,* and finally that Lewis did not suffer any permanent physical injury from the tasings or OC spray. *Id.* at 19.

Although Lewis' Complaint uses the "deliberate indifference" language derived from Eighth Amendment jurisprudence, *see Farmer v. Brennan,* 511 U.S. 825, 828 (1994), that provision does not apply until a suspect has been convicted. As stated above, the Seventh Circuit has held that the Fourth Amendment's reasonableness standard governs the present inquiry, rather than the deliberate indifference standard derived from the Eighth Amendment, where a pretrial detainee has not yet benefited from a *Gerstein* hearing. *See Ortiz,* 656 F.3d at 530. Four factors determine whether the Defendant Officers' response to Lewis' medical needs was objectively unreasonable: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Id.* Importantly, the seriousness of Lewis' medical condition need not rise to the level of objective seriousness

required under the Eighth and Fourteenth Amendments. *Williams*, 509 F.3d at 403. Rather, the Fourth Amendment's reasonableness test operates on a sliding scale, balancing the seriousness of the medical need with the scope of the requested treatment. *Id.* Lewis must also show that the Defendant Officers' conduct caused the harm of which he complains. *Ortiz*, 656 F.3d at 530.

Drawing all reasonable inferences in a light most favorable to the Plaintiff, Lewis has presented a genuine issue of material fact regarding whether the Defendants' conduct in denying him medical attention was objectively unreasonable. A reasonable juror could find that Lewis' bizarre behavior of incessant singing and drumming, coupled with his requests to go to a hospital, his requests for help and for his medicine, and his statement that he had neurology problems and was taking Topamax indicated a serious mental health condition that the Defendant Officers were aware of. The Court notes that there remains a dispute of material fact regarding the injuries Lewis sustained while at the Tazewell County Jail: although both parties agree Lewis suffered no permanent physical injury from the tasing or the use of OC spray, Lewis argues that he suffered permanent psychological injury from the incident. (ECF No. 60, ¶40). Moreover, a reasonable jury could find that the Defendant Officers' failure to take any steps to secure medical attention for Lewis (other than to give him a bandage after being tased) was unreasonable and that police interests did not weigh in favor of denying Lewis mental health treatment. For the foregoing reasons, Defendants' Motion (ECF No 56) is DENIED as to Lewis' claim for denial of medical attention.

### d. **Defendant Officers' Qualified Immunity Claim**

The Defendant Officers argue that because the standard to be applied to pretrial detainees was not clearly established as of December 9, 2009, it was not clearly established that Officer Karrick's use of the taser and OC spray against Lewis was a constitutional violation.

Accordingly, the remaining Defendant Officers argue they had no reason to intervene and a reasonable officer in their position would not have known it was unlawful not to provide medical care to Lewis.

Qualified immunity contemplates instances in which a public official's actions are not protected because the official knew or should have known he was violating an individual's constitutional rights. *See Sornberger v. City of Knoxville*, 434 F.3d 1006, 1014 (7th Cir. 2006) *citing Butz v. Economou*, 438 U.S. 478, 506-07 (1978) ("It is not unfair to hold liable the official who knows or should know he is acting outside the law, and that insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment."). Whether the Defendant Officers are entitled to qualified immunity requires this Court to first determine whether the Defendant Officers violated a constitutional right, and if so, whether that constitutional right was clearly established at the time of the arrest. *Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003). As indicated above, the Court finds that, in viewing the facts in the light most favorable to the Plaintiff, the record could support a claim for a violation of a constitutional right as to his excessive force claim, failure to intervene, and denial of medical attention. Accordingly, the Court then must determine whether or not these rights were clearly established at the time of the injury.

As to Lewis' excessive force claim and his denial of medical attention claim, it is this Court's finding that at the time of the incident, the Seventh Circuit had long held that the Fourth Amendment protects a person's rights until she has had a probable cause hearing. *See Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999) ("There is, to be sure, a difference between the constitutional provisions that apply to the period of confinement before and after a probable cause hearing: the Fourth Amendment governs the former and the Due Process Clause the

latter."); *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) (same). As of December 9, 2009, the Seventh Circuit had announced that the Fourth Amendment's reasonableness standard applies to pretrial detainees. *See Lopez*, 464 F.3d at 719. ("Our cases thus establish that the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction."); *see also Williams*, 509 F.3d at 403. To the extent that *Forrest v. Prine*, 620 F.3d 729 (7th Cir. 2010) might be read to contradict the Seventh Circuit's prior holdings in *Lopez* and *Williams*, this opinion was announced after the incident in question.

As of December 9, 2009, it was clearly established that "police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever." *See Payne*, 337 F.3d at 780; *see also Titran v. Ackman*, 893 F.2d 145, 148 (7th Cir. 1990) (finding that it was unreasonable for officers to intentionally restrain, jolt, and rough up a pretrial detainee without physical provocation). As noted above, Lewis contends that he was compliant for a period of time immediately prior to the OC spray deployment. The treatment he alleges he received would be contrary to established law. Based on the aforementioned facts, Defendant Karrick is not entitled to qualified immunity as to Lewis' excessive force claim.

It was also clearly established that that providing no medical care in the face of a serious health risk constitutes deliberate indifference. *See Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). Similar to the plaintiff in *Ortiz*, "this is not a case where prison officials provided substandard medical care and [the Court] must decide whether they crossed a line from medical malpractice (negligence) to deliberate indifference (recklessness)." *Ortiz*, 656 F.3d at 538-539. Rather, Lewis' claim is that the Defendant Officers were aware of Lewis' manic state and were

deliberately indifferent his serious medical need.   At this stage, the Court finds it would be improper to grant the Defendant Officers qualified immunity as to this claim.

Because the Court finds that Lewis has alleged a violation his constitutional right to be free from excessive force, the question of whether the remaining Defendant Officers had a duty to intervene turns on "whether it would have been clear to a reasonable officer that [Karrick's] actions constituted unreasonable force under the circumstances." *Abdullahi v. City of Madison*, 423 F.3d 763, 775 (7th Cir. 2005).  Given the record now before the Court, including the video recording which shows that the Defendant Officers were in the immediate vicinity during the incident and either encouraged or consulted with Karrick prior to her deployment of the OC spray, it appears that Karrick's actions were visibly obvious.  It is this Court's ruling that a jury should decide whether Karrick's actions would have made it clear to a reasonable officer that intervention was warranted, and, if so, whether the remaining Defendant Officers had a realistic opportunity to intervene.  Accordingly, the remaining Defendant Officers' claim for qualified immunity is DENIED as to the failure to intervene claim.

### e.  **Defendant Sheriff Huston's *Monell* Claim**

In Count V of his Complaint, Lewis alleges that the following practices, policies, and customs existed within the Tazewell County Jail:

a. arbitrary use of excessive force against pretrial detainees;

b. failure to deter sheriff deputies from the type of misconduct alleged in this Complaint, by its lack of discipline for misconduct, and defective investigations.

c. failure to provide proper medical attention for pretrial detainees with mental health disorders.

d. failure to properly train sheriff's deputies in how to handle pretrial detainees with mental health disorders.

(ECF No. 1, ¶104).   Plaintiffs seeking to impose § 1983 liability on local governments must prove that their injury was caused by "action pursuant to official municipal policy," which includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. *Monell* v. *New York City Dept. of Social Servs.*, 436 U.S. 658, 69 (1978).   Defendants concede that the Defendant Officers "were acting according to department policy and procedure in their handling of Lewis," (ECF No. 56 at 22), but that because there was no underlying constitutional violation by any of the Defendant Officers, Lewis cannot properly bring a *Monell* claim against Defendant Huston.  Because the Court has ruled that Lewis' constitutional claims regarding the conditions of his confinement, excessive force, failure to intervene, and denial of medical attention survive summary judgment, it is this Court's ruling that a jury should be allowed to determine whether Defendant Huston is liable under *Monell*.   Accordingly, Defendant Huston's motion for summary judgment on this ground is DENIED.

**f.  State Law *respondeat superior* Claim as to Defendant Huston**

Defendant Huston moves for summary judgment on Lewis' *respondeat superior* claim, arguing that because Karrick has no liability to Lewis, he cannot liable to Lewis under a theory of *respondeat superior*.   However, because the Court has ruled that summary judgment is not appropriate on Lewis' underlying claim of excessive force against Defendant Karrick, the Court DENIES Defendant Huston's Motion for Summary Judgment on this ground.

**CONCLUSION**

For the reasons set forth herein, Plaintiff's Amended Motion for Summary Judgment (ECF No. 59) is DENIED and Defendants' Motion for Summary Judgment (ECF No. 56) is GRANTED IN PART as to Lewis' § 1983 claim against Defendant Taylor for failing to

intervene during the allegedly unconstitutional use of OC spray and is DENIED in all other respects.


Entered this <u>7th</u> day of <u>March</u> 2013.


  <u>/s/ Michael M. Mihm</u>
Michael M. Mihm
United States District Judge
